**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE KRAM

DIVERSIFIED GLASS SERVICES, INC.,
Individually And On Behalf Of Itself and All
Others Similarly Situated,

Case No.

08 CV 0903

COMPLAINT

Plaintiff,

v.

**CLASS ACTION**

**(DEMAND FOR JURY TRIAL)**

Pilkington North America, Inc., Nippon Sheet
Glass, AGC Group (f/k/a AFG Glass or AFG
Industries, Inc.), Asahi Glass Co. Ltd., Saint-
Gobain Corporation, Saint-Gobain SA, Guardian
Glass Corporation, and Co-Conspirators I - X,

Defendants.



JAN 2 5 2008

U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff, Diversified Glass Services, Inc., on behalf of itself and all others similarly

situated, brings this antitrust class action against Defendants, among the largest flat glass

manufacturers in the world, for treble damages and injunctive relief under the United States,

Section 1 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. § 1 and Sections 4 and 16 of

the Clayton Antitrust Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15, 26.  Plaintiff makes the

following allegations upon information and belief and the investigation of counsel, except as to

the Plaintiff, which are based on personal knowledge:

### NATURE OF THE ACTION

1.    This case relates to a cartel among the world's leading manufacturers of flat

glass to collude on the use and imposition of so-called energy surcharges to overcharge

Plaintiff and other direct purchasers of flat glass.

2.    "Flat glass" refers to glass manufactured through the "float process" whereby

molten glass is fed into a bath containing a denser substance, usually molten tin, allowing the

molten glass to literally "float" on the surface of the molten tin.  Defendants are among the world's largest flat glass manufacturers.

3.     Beginning in or around October 2000, Defendants agreed to adopt a common complex formula to measure energy surcharges and implemented a common $300 per truck-load energy surcharge, ostensibly relating to the cost of natural gas, on top of the cost of the flat glass.  The common $300 surcharge was announced several weeks in advance of its imposition by one flat glass manufacturer, then rapidly implemented by others.

4.     From the year 2000 forward, through at least 2007, Defendants repeatedly colluded to impose common energy surcharges, using the same or substantially the same formula.

5.     On or about March 14, 2007, the European Commission antitrust regulators ("EC") served Saint-Gobain SA ("Saint-Gobain") and Pilkington plc's parent company ("Pilkington") with a Statement of Objection, which alleged that they were members of a cartel within the flat glass industry to fix or otherwise maintain the price of flat glass and related energy surcharges.

6.     During May 2007, Saint-Gobain informed its shareholders that it *would not dispute* the EC's antitrust charges that it was a member of a price-fixing cartel within the flat glass industry and would set-aside €650 million for price-fixing fines.

7.     Defendants' imposition of common energy surcharges on truck-loads of flat glass in North American markets, including in the United States, mirrors what Pilkington and its  horizontal competitors and co-conspirators implemented in Europe.

8.     During the class periods (defined below), Defendants have publicly represented that their energy surcharges reflected the actual increased cost of natural gas and diesel fuel

(collectively, "energy surcharges"), and that such increased costs simply were being passed along to the purchasers.

9.    In fact, however, Defendants entered into a cartel and agreed to implement and calculate the energy and diesel surcharges in a manner designed to impose and conceal millions of dollars in illicit overcharges.

10.    Plaintiff brings this action on its own behalf and as a representative, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of the following Classes:

> (A)  All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' co-conspirators) in the United States that purchased flat glass directly from any of the Defendants, or Defendants' predecessors, subsidiaries, affiliates or agents, and paid energy surcharges relating to natural gas at any time during the period from January 1, 2001, through such time in the future as the effects of Defendants' illegal conduct, as alleged herein, has ceased.

> (B)  All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' co-conspirators) in the United States that purchased flat glass directly from any of the Defendants, or Defendants' predecessors, subsidiaries, affiliates or agents, and paid energy surcharges relating to diesel fuel at any time during the period from October 16, 2005, through such time in the future as the effects of Defendants' illegal conduct, as alleged herein, has ceased.

## JURISDICTION AND VENUE

11.    Plaintiff lodges this class action complaint against Defendants by reason of their violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as for injunctive relief, treble damages and costs of this action, including attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

12.    This Court has original federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

13.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b) and (c) because during the Class Periods Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

## PARTIES

14.    Plaintiff Diversified Glass Services, Inc., is a corporation and resident of Rochester Hills, Michigan.  During the Class Periods, Plaintiff and its subsidiaries purchased flat glass and paid energy surcharges to several of the Defendants, and others.

15.    Defendant Guardian Glass Corporation, Inc., ("Guardian") is a privately-held company based in Auburn Hills, Michigan, with European headquarters in Bascharage, Luxembourg.  Guardian produces flat glass for the automotive, construction, and decorative industries.  It has more than 70 domestic facilities in the United States and has numerous plants and distribution centers in Europe.  On November 28, 2007, Guardian was ordered to pay €148,000,000 as part of the EC's investigation into the flat glass cartel.

16.    Defendant Pilkington North America, Inc., ("Pilkington") of Toledo and Rossford, Ohio, is a wholly-owned subsidiary of Pilkington plc.  Pilkington plc's headquarters is located in the United Kingdom.  On June 16, 2006, Pilkington was acquired by Nippon Sheet Glass Company of Japan.  Pilkington produces glass for the automotive and building products industries, and it is a major supplier of glass to replacement windshield shops in

Europe, the Americas, and the Asia/Pacific region. Pilkington also manufactures building products including glass designed to insulate buildings to control energy and noise. The company's automotive glass products include solar control glass, security glazing, and glass heating systems. Pilkington has operations worldwide. Pilkington has acknowledged that it was served with a Statement of Objection for engaging in a cartel to fix the price of flat glass and related energy surcharges. During the Class Periods, Pilkington unlawfully conspired with the other Defendants within the flat glass industry to fix, peg, raise, maintain and/or stabilize prices for energy surcharges. On November 28, 2007, Pilkington was ordered to pay €140,000,000 as part of the EC's investigation relating to the flat glass cartel.

17.    Defendant Nippon Sheet Glass ("Nippon") is a Japan-based manufacturer engaged in three business segments. The Construction Use Glass segment manufactures, processes and sells float plate glass, polished wire glass, heat absorbing glass, heat reflecting glass, reinforced glass, laminated glass, double-layer glass, vacuum glass, fireproof glass, template glass, mirror and ornamental glass, as well as sashes. The Automobile Use Glass segment offers float plate glass, laminated glass, reinforced glass, infrared ray cutting glass, glass antenna, water-shedding glass, light control glass, antifogging glass and security glass. Nippon wholly owns Pilkington and is being named as a parent of Pilkington. During May 2007, Nippon announced that it set-aside $691 million for fines relating to Pilkington's alleged membership in a cartel within the flat glass industry to fix, peg, raise, maintain and/or stabilize prices for energy surcharges.

18.    Defendant AGC Group ("AGC") (f/k/a AFG Glass and AFG Industries, Inc.) of Kingsport, Tennessee, is the North American division of Glaverbel SA ("Glaverbel") (n/k/a, AGC Group), which is based in Brussels, Belgium. AGC is a wholly owned subsidiary of

Asahi Glass Company Ltd. During the Class Periods and pursuant to Asahi's annual report, AGC looked to its EU headquarters for developing strategies to enhance competitiveness. AGC makes and processes flat glass for the construction industry (exterior glazing and interior decorative glass) and for specialized industries. AGC has 40 float glass plants located throughout Europe, North America and Asia. AGC Flat Glass Europe acknowledged that it was served with a Statement of Objection for participating in a cartel to fix the price of flat glass and related energy surcharges. During the Class Periods, AGC unlawfully conspired with the other Defendants within the flat glass industry to fix, peg, raise, maintain and/or stabilize prices for surcharges.

19.    Defendant Asahi Glass Company Ltd. ("Asahi") is a Japan-based glass manufacturer. Along with its subsidiaries and associates, Asahi has four business segments. The Glass segment chiefly manufactures and sells sheet glass, glass for automobiles, construction materials and others. Asahi wholly owns AGC Flat Glass Europe and AGC North America. Asahi is being named as the parent of AGC, which is alleged to be a member of a cartel within the flat glass industry to fix, peg, raise, maintain and/or stabilize prices for energy surcharges. On November 28, 2007, Asahi was ordered to pay €65,000,000 as part of the EC's investigation relating to the flat glass cartel.

20.    Saint-Gobain Corporation is headquartered in Valley Forge, Pennsylvania, and also has subsidiary headquarters in Arizona, Michigan, New Jersey, and Washington. In North American markets, some of its brands include BPB, CertainTeed, Euroglass Corp., Exprover, Norton, Sekurit USA, Solarglas, VetroTech and Vetrotex. During the Class Periods, Saint-Gobain Corporation unlawfully conspired with the other Defendants within the flat glass industry to fix, peg, raise, maintain and/or stabilize prices for energy surcharges.

- 6 -

21.    Saint-Gobain SA ("Saint-Gobain") is headquartered in Courbevoie, France, and is a producer, processor, and distributor of numerous materials (glass, ceramics, plastics, cast iron, etc.). Saint-Gobain's North American flat glass operations are controlled by Saint-Gobain Corporation. Saint-Gobain transforms raw materials into advanced products for every day use, such as glass for building and automotive applications. It operates in 54 countries worldwide and fields a workforce of over 207,000. Saint-Gobain has over 45 subsidiaries or affiliates in United States. Saint-Gobain is listed on the stock markets in Paris, London, Frankfort, Zurich, Brussels, and Amsterdam. Its website makes the claim that it is Europe's number 1 and the world's number 3 flat glass producer. On April 26, 2007, Saint-Gobain acknowledged that it was served with a Statement of Objection for engaging in a cartel to fix the price of flat glass and related energy surcharges. During May 2007, Saint-Gobain announced that *it would not dispute the EC's allegations that it participated in a cartel to fix prices of flat glass*, and it set aside €650 million for penalties. On November 28, 2007, Saint-Gobain was ordered to pay €133,900,000 as part of the EC's investigation relating to the flat glass cartel.

### UNNAMED CO-CONSPIRATORS

22.    On information and belief, at all relevant times, other flat glass manufacturers, referred to herein as "additional co-conspirators" conspired with Defendants in their unlawful restraint of trade. All averments herein against named Defendants are also averred against these additional co-conspirators as though set forth in full.

### DEFENDANTS' AGENTS

23.    Each Defendant acted for itself or by and through its local agents, who sold flat glass with energy surcharges for it and under its name. As such, each Defendant is responsible

- 7 -

for all acts or omissions of any of its agents. The acts complained of herein have been within the apparent authority of the Defendants, have been to their benefit, and have been ratified by Defendants.

## RELEVANT NON-PARTIES

24.     PPG Industries, Inc. is a publicly traded company based in Pittsburgh, Pennsylvania, with European operations in England, France, Germany, and Italy. PPG produces flat glass for the automotive, construction, and decorative industries. Although PPG is not a named defendant, its implementation and increases of energy surcharges mirrors that of Defendants Pilkington and AGC.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on its own behalf and as a representative, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of the following Classes:

> (A) All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' co-conspirators) in the United States that purchased flat glass directly from any of the Defendants, or Defendants' predecessors, subsidiaries, affiliates or agents, and paid energy surcharges relating to natural gas at any time during the period from January 1, 2001, through such time in the future as the effects of Defendants' illegal conduct, as alleged herein, has ceased.

> (B) All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' co-conspirators) in the United States that purchased flat glass directly from any of the Defendants, or Defendants' predecessors, subsidiaries, affiliates or agents, and paid energy surcharges relating to diesel fuel at any time during the period from October 16, 2005, through such time in the future as the effects of Defendants' illegal conduct, as alleged herein, has ceased.

26.    Because such information is in the exclusive control of Defendants, Plaintiff does not know the exact number of Class members. Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and so geographically dispersed throughout the United States that joinder of all Class members is impracticable.

27.    There are questions of law or fact common to the Classes, which predominate over individual issues, including:

       a.    Whether Defendants engaged in a combination or conspiracy among themselves to unlawfully institute and implement energy surcharges in the United States;

       b.    Whether Defendants engaged in a combination or conspiracy among themselves to unlawfully fix, peg, raise, maintain, and/or stabilize energy surcharge prices charged for energy surcharges within the United States;

       c.    The duration of the conspiracy alleged in this Complaint, and the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

       d.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

       e.    The effect of Defendants' conspiracy on the energy surcharge prices, and ultimate prices, charged for flat glass within the United States during the Class Periods;

       f.    Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the Plaintiff and the other members of the Classes; and

       g.    The appropriate measure of damages sustained by Plaintiff and other members of the Classes.

28.    Plaintiff will fairly and adequately protect the interests of the Classes, and its interests are coincident with and not antagonistic to those of other members of the Classes.

Plaintiff is represented by counsel competent and experienced in the prosecution of complex litigation, including antitrust class action litigation.

29.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment is necessary to permit adjudication of claims by many Class members who otherwise could not justify the considerable expense to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties in management that would preclude maintenance as a class action.

30.    The members of the Classes are readily identifiable from the files of Defendants.

**INTERSTATE TRADE AND COMMERCE**

31.    Flat glass is fungible. One Defendant's basic product is indistinguishable from that of another, and can be readily substituted for the product of a competitor prior to fabrication and/or coatings, and is readily transferable.

32.    During a 2004 conference call with investors, Jean-Louis Beffa, Chairman and CEO of Saint-Gobain, characterized the flat glass product as a commodity.

33.    Demand for flat glass is inelastic.

34.    Flat glass is typically sold to direct purchasers by the truck-load.  A truck-load contains approximately 10,000 - 12,000 square feet of product and weighs 40,000 pounds, which includes packaging.  Flat glass may also be sold in quantities less than a truck-load.

35.    The market for the production and distribution of flat glass is a multi-billion dollar industry nationally.    Flat glass is used, inter alia, for buildings and homes, and automobiles.

36.    The national and global markets for flat glass are dominated by an oligopoly of major manufacturers, including Defendants.

37.    Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce between Defendants and members of the Plaintiff classes who were located in states other than the states in which Defendants are located, and had a direct, substantial, and reasonably foreseeable effect upon interstate commerce.

## DEFENDANTS AND THE
## FLAT GLASS INDUSTRY

38.    Defendants are each other's principal horizontal competitors in the production and sale of flat glass in the United States and abroad.

39.    The flat glass industry is highly concentrated both domestically and globally. Defendants Saint-Gobain, Nippon, Asahi, and Guardian have a combined global market share of over 67%.

40.    Citibank has reported that as of 2005, flat glass global production was about 41 million tons, 70% of which is building glass.

41.    Citibank has reported that as of 2005, the global market was divided as follows: Pilkington (including affiliates), 20.5%; Asahi (including AGC), 20.5%; Saint-Gobain, 14%; Guardian, 13.5%; PPG, 5%; Taiwan Glass, 3.9%; and others, 23%.

42.    Pilkington's 2004 annual report details that it, Saint-Gobain, Asahi, and Guardian, collectively represent 62% of the global market for float glass.

43.    The flat glass industry has high barriers to entry, including the high cost of building manufacturing plants (in the range of $100 million or more), distribution systems, and various environmental issues.

44.    Over supply in the flat glass industry can lead to rapid swings in pricing.

45.    Energy costs are a variable cost to Defendants.  When energy costs increase, without a concomitant offsetting increase in demand, the profits of Defendants will decrease.

46.    Companies have various methods available to them to protect against fluctuations in energy costs, including entering into long-term supply contacts with suppliers of natural gas to hedge the volatility of energy prices.

47.    Defendants, however, agreed to implement, fix, and maintain energy surcharges in excess of actual energy costs.

48.    The flat glass industry is characterized by slim profit margins.  Defendants are motivated to combine and conspire by the necessity of decreasing their operating ratios to a level that continues to ensure the viability of continued individual operations.

49.    Industry conferences, such as the Glass Expo Midwest and Glass Forum, are conducted frequently and attended by all members of the flat glass industry, including Defendants' representatives.

## THE NATURE OF THE UNLAWFUL CONSPIRACY

50.    In or about October 2000, Defendants began imposing what they called energy surcharges, on top of their prices for flat glass.  Though it is exceedingly unlikely that Defendants have identical energy costs, because, inter alia, manufacturing plants are not identical and manufacturers can, and did adopt different hedging strategies against the costs of natural gas, Defendants adopted and implemented identical surcharges.

- 12 -

51.    The Defendants agreed to fix, peg, raise, and maintain natural gas, energy surcharges by adopting a common surcharge formula pegged to the New York Mercantile Exchange, Inc. ("NYMEX") futures.

52.    Defendants' energy surcharges, calculated by this formula, exceeded the true increase in average energy costs incurred by the industry. The energy surcharges also were higher than would have prevailed in a competitive market. But for the illegal agreement, Plaintiff class members would have paid no, or lower, energy surcharges, and ultimately would have paid less for flat glass from Defendants.

53.    The Defendants' energy surcharges were reportedly applied across all types of flat glass, regardless of the actual, underlying cost of producing particular types of flat glass, and thus were simpler for Defendants to agree on and monitor than product-specific price increases would have been.

54.    The public announcements that preceded the imposition of the surcharges facilitated collusion by allowing Defendants to communicate and signal to each other concerning the surcharges in advance of their imposition.

55.    The automatic nature of the surcharges – being tied to a common formula – further facilitated collusion by allowing Defendants to collude over an extended period of time without have to repeatedly renegotiate their agreement.

56.    Defendants knowingly engaged in price fixing, a per se violation of the antitrust laws, as well as an unreasonable agreement in restraint of trade, by conspiring to calculate energy surcharges imposed on their customers via a common formula, as set forth below:

A.    Natural Gas Surcharges in the United States

| NYMEX 3-Month Average (MMBTU) | Surcharge per truck-load |
| --- | --- |
| $9.00 - 9.55 | $1,400 |

| | |
|---|---|
| $8.50 - 8.99 | $1,300 |
| $8.00 - 8.49 | $1,200 |
| $7.50 - 7.99 | $1,100 |
| $7.00 - 7.49 | $1,000 |
| $6.50 - 6.99 | $900 |
| $6.00 - 6.49 | $800 |
| $5.50 - 5.99 | $700 |
| $5.00 - 5.49 | $600 |
| $4.50 - 4.99 | $500 |
| $4.00 - 4.49 | $400 |
| $3.50 - 3.99 | $300 |
| $3.00 - 3.49 | $200 |

B.    Diesel Fuel Surcharges in the United States

| Dollar Per Gallon 12-Week Average | Surcharge per truck-load |
|---|---|
| $3.09 - 3.21 | $425 |
| $2.96 - 3.08 | $400 |
| $2.83 - 2.95 | $375 |
| $2.70 - 2.82 | $350 |
| $2.57 - 2.69 | $325 |
| $2.44 - 2.56 | $300 |
| $2.31 - 2.43 | $275 |

57.    Defendants implemented and adjusted energy surcharges at the same time and in the same amounts, regardless of actual costs.

58.    Defendants did not engage in price competition relating to energy surcharges.

59.    Defendants Saint-Gobain, Guardian, and Pilkington, have reported using long-term supply contacts to hedge price volatility of natural gas, undermining any claim by these Defendants that they needed to impose an energy surcharge charge at all, much less a uniform one.  For example:

(a)    During January 2004, Defendant Pilkington entered into a 10-year natural gas supply agreement with Enron Energy Services to manage its natural gas

- 14 -

requirements for its domestic manufacturing facilities in North Carolina, Kentucky, Indiana, Ohio, Michigan, Illinois, and California;

(b)   During a November 2004 conference call with investors, Defendant Saint-Gobain acknowledged that the company's strategy against increasing natural gas costs was to enter into long-term supply contracts and impose energy surcharges to customers; and

(c)   During 2005, Defendant Guardian entered into negotiations with Southern California Gas Company for a 15-year term supply contract for natural gas.

60.   Defendants' failure to engage in price competition relating to energy surcharges can be plausibly explained only by an agreement to charge identical or nearly identical surcharges. Defendants' charging of common surcharges despite each having different actual energy costs and different hedging strategies militates against any possibility that Defendants acted independently or for any legitimate business purpose. It would have been against the unilateral, individual self-interest of each Defendant to impose the surcharges at issue absent an agreement amongst Defendants.

61.   Defendants jointly and collectively, throughout the United States and Europe, profited from these unlawful "surcharges" in amounts totaling many millions of dollars, representing, inter alia, the difference between their actual energy costs and the amounts they unlawfully charged Plaintiff and the members of the classes.

62.   Saint-Gobain's introduction and adjustments of energy surcharges on truck-loads of flat glass in North American markets mirror those imposed in Europe and by the same horizontal competitors who were fined by the European Commission for price-fixing.

## THE CARTEL'S ACTIVITIES

63.    During October and November 2000, AGC, Guardian, Pilkington, and PPG Industries, Inc. ("PPG"), almost simultaneously imposed a natural gas energy surcharge, on top of the cost of flat glass, in an amount of $300 per truck-load in the United States, effective immediately.

64.    Effective January 2001, it was reported that AGC, Guardian, Pilkington, and PPG, each increased its energy surcharge in the United States to $500 per truck-load.

65.    Defendants' adjustments to natural gas surcharges within the United States from 2001 to 2003 were as follows:

| Dates | Natural Gas Energy Surcharge |
|---|---|
| 2Q 2001 | $500 |
| 3Q 2001 | $100 |
| 4Q 2001 | $0 |
| 1Q 2002 | $0 |
| 2Q 2002 | $200 |
| 3Q 2002 | $200 |
| 4Q 2002 | $300 |
| 1Q 2003 | $900 |
| 2Q 2003 | $700 |
| 3Q 2003 | $500 |

66.    On September 20, 2001, The Gale Group reported in an article entitled "Glass price hikes blamed on raw materials and fuel costs UK: Glass prices increase for second time in 2001," that Saint-Gobain, Pilkington, and Glaverbel jointly adopted flat glass price increases in the EU of 11% during March, and 9% during September 2001, allegedly reflecting the increase costs of raw materials, "particularly in the gas sector."

67.    During the 2003 Summer Northeast Window & Door Association meeting, Scott Hoover of Pilkington and Larry Tumminia of AGC gave a joint presentation on the *State of the Glass Industry - The Economic Future of Glass*. During this presentation, Messrs

Tumminia and Hoover openly discussed energy surcharges and told *the audience that they should expect an upward trend in prices*. Representatives of Guardian were also present at this meeting.

68.    On October 10, 2003, during a conference call with investors, William Hernandez, PPG's senior vice president and chief financial officer, acknowledged that flat glass price increases during 2003 were largely the result of natural gas energy surcharges.

69.    One former Director of Strategic Development at Guardian, who was with Guardian for approximately two years ending 2004, acknowledged that Defendants' having identical natural gas costs was impossible because the glass furnaces used to manufacture flat glass, even within the same plant, have different thermal efficiencies.

70.    On November 3, 2004, Stuart Chambers, Chief Executive of Pilkington, did a phone interview with AFX International about its quarterly results and fuel surcharges. During this phone interview, Mr. Chambers disclosed the mechanics of the diesel fuel surcharge, "The surcharge is based on a sliding scale linked to the price of Brent crude and deliveries of glass."

71.    Later during November 2004, the Financial Times also interviewed Mr. Chambers, Chief Executive of Pilkington.    In this article, the FT reported that energy surcharges were adjusted to $955 per truck-load, and that Pilkington generated approximately $15 million annually from energy surcharges in the North American market.

72.    During March 2005, Guardian, and PPG each announced their intention to adjust natural gas surcharges to $800 per truck-load, effective second quarter 2005.

73.    During May 2005, Guillerme Huguen, Managing Director of Saint-Gobain Glass UK, was interviewed by an industry organization. During this interview, Mr. Huguen was asked about the energy surcharge adopted in the EU during the 4Q 2004. In response, Mr.

Huguen reportedly stated that, "The surcharge has been applied [in Europe] since November now, and it has been fully justified... It seems to be working here and across Europe, just like it has been working for years now in the US."

74.     One former AGC salesperson, who was with AGC for approximately eighteen years ending 2005, was told by AGC corporate never to negotiate down or "play games" with energy surcharges, as opposed to product prices, while negotiating flat glass sales with prospective customers.

75.     During June 2005, Pilkington announced strong year-end results ending March 31, 2004, relying in part on its levying of energy surcharges in the EU and North American markets. Pilkington also announced that it would increase its dividend to shareholders

76.     Announced during September and October 2005, Saint-Gobain, AGC, Guardian, Pilkington, and PPG, each introduced diesel surcharges of $275 per truck-load for North American markets, effective fourth quarter 2005. Natural gas related energy surcharges were increased to $1,200 per truck-load, effective fourth quarter 2005.

77.     Announced during December 2005, Saint-Gobain, AGC, Pilkington, and PPG each raised diesel and natural gas energy surcharges to $375 and $2,100 per truck-load, effective first quarter 2006.

78.     During the later part of first quarter 2006, Saint-Gobain, Guardian, Pilkington, and PPG each announced that it would adjust diesel and natural gas surcharges to $300 and $1,400 per truck-load, effective second quarter 2006.

79.     During June 2006, Saint-Gobain, Guardian, Pilkington, and PPG each announced that it would adjust diesel and natural gas surcharges to $350 and $900 per truck-load, effective third quarter 2006.

80.    During September 2006, Saint-Gobain, AGC, Pilkington, and PPG each announced that it would adjust diesel and natural gas surcharges to $400 and $900 per truck-load, effective fourth quarter 2006.

81.    During December 2006, Saint-Gobain, Guardian, and Pilkington, each announced that it would adjust diesel and natural gas surcharges to $300 and $900 per truck-load, effective first quarter 2007.

82.    During March 2007, Saint-Gobain and Guardian each announced that it would keep diesel and natural gas surcharges at $300 and $900 per truck-load, effective second quarter 2007.

## EUROPEAN COMMISSION OPENS AN INVESTIGATION RELATING TO A CARTEL WITHIN THE FLAT GLASS INDUSTRY

83.    On February 22 and 23, 2005, the EC antitrust authority conducted a raid on offices of Saint-Gobain in Paris, France, Aachen, Germany, and Sweden. On February 24, 2005, the EC also raided the offices of Pilkington in the United Kingdom, AGC (f/k/a Glaverbel SA in Europe) in Belgium, and Guardian Glass Company's European office.

84.    The EC's raids related to the alleged price-fixing of flat glass and the introduction of an energy surcharge on sales of flat glass. The EC stated that "[t]he Commission has reason to believe that the companies concerned may have violated (a European Union) treaty, which prohibits practices such as price fixing."

85.    In the United States, in April/May 2005, Defendants implemented the same response to complaints about their diesel fuel surcharges – Defendants Guardian, AFG (now AGC) and Pilkington each substituted a 3% price hike in place of the diesel surcharge.

86.    On March 14, 2007, the EC antitrust authority confirmed that it served Statements of Objections to a number of glass manufacturers alleging their role in a cartel to fix the price, allocate markets, and implement so called "energy surcharges" for flat glass.

87.    On March 14, 2007, Saint-Gobain acknowledged that it was served with a Statement of Objection.

88.    On March 14, 2007, Asahi acknowledged that on March 13, 2007, Glaverbel SA (AGC's European affiliate) was served with a Statement of Objections with respect to alleged anticompetitive conduct within the flat glass industry.

89.    On March 15, 2007, Nippon acknowledged that on March 13, 2007, Pilkington was served with a Statement of Objections with respect to alleged anticompetitive conduct within the flat glass industry.

90.    On May 23, 2007, Nippon announced that it would set-aside $691 million for penalties relating to Pilkington's alleged participation in a cartel to fix prices of flat glass and related energy surcharges.

91.    On May 24, 2007, Saint-Gobain announced that *it would not dispute the EC's allegations that it participated in a cartel to fix prices of flat glass and related energy surcharges* and set-aside €650 million for penalties.

92.    On November 28, 2007, the EU ordered Asahi, Guardian, Pilkington, and Saint-Gobain to pay a total of €486,900,000 in antitrust fines for their participation in a cartel relating to the flat glass cartel.

93.    The same or substantially the same flat glass price adjustments and energy surcharges at issue in the EC's complaint, which Saint-Gobain has announced that it would not

dispute, were also implemented and increased in North American markets by Saint-Gobain and its co-conspirators.

94.    Defendants fraudulently concealed their price-fixing conduct and their participation in the cartel and conspiracy alleged herein. Plaintiff and the Classes could not have discovered the existence of the conspiracy alleged herein any earlier than its public disclosure. Defendants did not reveal that their imposition of surcharges was pursuant to agreement.

95.    Defendants' conduct constitutes a *per se* violation of Section 1 of the Sherman Act.

## COUNT I
## VIOLATIONS OF THE SHERMAN ACT

96.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

97.    During the Class Periods, Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to implement, artificially raise, fix, maintain, and/or stabilize the prices of flat glass related energy surcharges, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

98.    In formulating and effectuating the alleged contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the prices of flat glass related energy surcharges.

99.    During the Class Periods, Plaintiff and members of the Classes purchased flat glass with energy surcharges directly from Defendants and their co-conspirators (or their respective agents, predecessors, subsidiaries, affiliates, and/or business partners).

- 21 -

100.    The illegal combination and conspiracy alleged herein had the following effects, among others:

(a)    price competition in the pricing of flat glass related energy surcharges has been restrained, suppressed, and/or eliminated;

(b)    prices charged by Defendants for flat glass related energy surcharges were fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels;

(c)    prices paid by Plaintiff and members of the Classes for flat glass related energy surcharges charged by Defendants have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels; and

(d)    Defendants refused to engage in price competition for flat glass related energy surcharges.

101.    Defendants' anticompetitive activities and their effects are in violation of the Sherman Act.

102.    During the Class Periods, Defendants sold flat glass in a continuous and uninterrupted flow of interstate and foreign commerce. Defendants received payment for such services across state boundaries. Defendants' activities, and the sale of their services, have both taken place within, and have had a substantial anticompetitive effect upon, interstate commerce within the United States.

103.    Plaintiff and members of the Classes seek injunctive relief, and treble damages, and any such other relief that the Court deems necessary and appropriate.

104.    Plaintiff and members of the Classes have been required to pay more for flat glass energy surcharges in the United States than they would have paid in a competitive marketplace absent Defendants' price-fixing cartel.

105.    During the Class Periods, Defendants' flat glass related energy surcharge conspiracy as described herein caused Plaintiff and the members of the Classes to pay artificially inflated prices for flat glass related energy surcharges that they would not have paid absent such violations. As a result, Plaintiff and the members of the Classes have been injured and damaged in their business and property in an amount to be determined according to proof.

106.    As a direct and proximate result of Defendants' illegal conspiracy, Plaintiff and the members of the Classes have been injured and damaged in their respective businesses and property, in that they have paid artificially inflated prices during the Class Periods that they would not have paid in the absence of the illegal conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.    The Court certify the Classes as follows:

(A)  All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' co-conspirators) in the United States that purchased flat glass directly from any of the Defendants, or Defendants' predecessors, subsidiaries, affiliates or agents, and paid energy surcharges relating to natural gas at any time during the period from January 1, 2001, through such time in the future as the effects of Defendants' illegal conduct, as alleged herein, has ceased.

(B)  All individuals or entities (excluding governmental entities, Defendants, and Defendants' parents, predecessors, subsidiaries, affiliates, agents and Defendants' co-conspirators) in the United States that purchased flat glass directly from any of the Defendants, or Defendants' predecessors, subsidiaries, affiliates or agents, and paid energy surcharges relating to diesel fuel at any time during the period from October 16, 2005, through such time

in the future as the effects of Defendants' illegal conduct, as alleged herein, has ceased.

C.    The Court adjudge and decree that the contract, combination and conspiracy alleged herein is a per se unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

D.    Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and the Classes for damages as allowed by law in an amount determined to have been sustained by them;

E.    The Court award Plaintiff and the Classes attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law;

F.    The Court enjoin and restrain Defendants from engaging in any such agreement and price-fixing in the future; and

G.    Award Plaintiff and the Classes such other further relief as may be necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all

of the claims asserted in this Complaint so triable.

Dated: January 25, 2008

MILBERG WEISS LLP

_____

Peter Safirstein, Esq.
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Tel:    (212) 594-5300
Fax:    (212) 868-1229
psafirstein@milbergweiss.com

BERGER & MONTAGUE, P.C.
Merrill G. Davidoff, Esq.
David F. Sorensen, Esq.
Eric L. Cramer, Esq.
Michael Dell Angelo, Esq.
Matthew McCahill, Esq.
1622 Locust Street
Philadelphia, Pennsylvania 19103
Tel:    (215) 875-3000
mdavidoff@bm.net
dsorensen@bm.net
ecramer@bm.net
mdellangelo@bm.net
mmccahill@bm.net

Joseph R. Saveri, Esquire
Lieff Cabraser Heimann & Bernstein, LLP
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA 94111-3339
Tel.    (415) 956-1000
jsaveri@lchb.com

Steven E. Fineman, Esquire
Lieff Cabraser Heimann & Bernstein, LLP
780 Third Avenue, 48th Floor
New York, NY 10017-2024
Tel. (212) 355-9500
sfineman@lchb.com

*Counsel for Plaintiff*